SO ORDERED.

SIGNED this 20 day of October, 2006.

_J. Rich Leonard_
United States Bankruptcy Judge

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

IN RE:

    DENNIS MUGNO,

          Debtor.                     Case No. 05-09231-8-JRL
                                              Chapter 7

_____

## ORDER

       This case is before the court on the Chapter 7 trustee's motion for disqualification of counsel and motion for disgorgement of fees.[1] The court conducted a hearing on these matters on August 17, 2006 and August 21, 2006, and it heard closing arguments on September 5, 2006.

## FINDINGS OF FACTS

       1.      Peter K. Gemborys, Sr., is a licensed North Carolina attorney authorized to practice law

_____

[1]In addition to the relief requested in the Chapter 7 trustee's motions, the brief supporting such motions requests suspension or disbarment, monetary sanctions, and reimbursement of attorneys' fees and costs to the estate. Due to the volume of exhibits filed by the Chapter 7 trustee the evening before the originally scheduled hearing date of July 19, 2006, the court continued the hearing on these motions for one month in order to give the court, the debtor, and the debtor's attorney adequate preparation time.

before this court.

2.      Mr. Gemborys is subject to the Rules of Professional Conduct, as adopted by the North Carolina Supreme Court and as adopted by this court pursuant to Local Rule 9010-1.

3.      Mr. Gemborys represented the debtor, Dennis Mugno, in this bankruptcy case.

4.      On July 29, 2004, Mr. Mugno sold real property in Suffolk County, New York ("the New York property") for $381,100.00 and received proceeds of $62,204.83. This is supported by records provided by the closing attorney, Neal Sultzer.

5.      Mr. Mugno resided at the New York property with his fiancé, Terri Yodice, and their minor child, Brianna Mugno.[2]

6.      Ms. Yodice and Brianna Mugno had no interest in the New York property.

7.      After moving to Wilmington, North Carolina, in July 2004, Mr. Mugno began working for Wilmington Hyundai as a salesman.

8.      By September 2004, Mr. Mugno, Ms. Yodice, and Brianna Mugno were all residing in Wilmington, North Carolina.

9.      On September 23, 2004, Myrtle Carter, the mother of Ms. Yodice, purchased real property located at 7325 Haven Way, Wilmington, North Carolina ("the Wilmington property"). Ms. Carter made a down payment on the Wilmington property by certified check in the amount of $43,270.84.

10.     Ms. Yodice admitted that Ms. Carter used funds withdrawn from Brianna Mugno's savings

_____

[2]At the August 17, 2006 hearing, Mr. Mugno revealed that he and Ms. Yodice had married the previous week. However, prior to filing bankruptcy and throughout the majority of this case, the debtor was not married to Ms. Yodice.

account to make the down payment on the Wilmington property.

11.    Ms. Yodice failed to provide credible evidence regarding the source of the funds for the down payment that were withdrawn from Brianna Mugno's savings account. Ms. Yodice testified that the funds had come from a number of sources; however, none of these sources were substantiated. The alleged sources included proceeds in an amount that Ms. Yodice could not remember from an unwritten separation settlement with her former husband, untraceable proceeds from her father's life insurance in amounts that she could not remember, and untraceable proceeds from the sale of property located in Myrtle Beach, South Carolina.

12.    Mr. Mugno failed to provide credible evidence regarding the use of the proceeds that he received from the sale of the New York property. At the hearing held May 2, 2006, Mr. Mugno stated that an unnamed friend at a branch of Fleet Bank in New York had cashed the check of sales proceeds for him. Mr. Mugno claimed that he used approximately $40,000.00 of the proceeds to pay off gambling debts to a man named Teddy that he often met at a nearby Seven-Eleven store. Mr. Mugno had no corroboration of that transaction. Mr. Mugno said that, as a result of his significant gambling debt, an anonymous person had called him and threatened his life if he did not pay off the debt. Mr. Mugno asserted that the debt stemmed from calling a 1-800 number in the Carribean; however, he asserted that the gambling outfit had no name and that he spoke to different people each time that he called. He knew none of the names of the individuals who allegedly took his bets. Mr. Mugno stated that he had been a gambler for ten years and that he would win $10,000.00 one week and lose $20,000.00 another. Mr. Mugno had never reported his gambling wins and losses on his tax returns. Mr. Mugno claimed that he had lived off the approximately $22,000.00 in remaining proceeds for one year, and that he had kept those remaining

proceeds in a safe at his home. At later hearings, when questioned about the whereabouts of the money, Mr. Mugno did not repeat this story of the gambling debt payoff. Rather, he pled the Fifth Amendment. Mr. Mugno had no records to substantiate this story about what happened to the $62,204.83 in sales proceeds. The court gave the debtor an opportunity to present documentary evidence that he did not provide the funds for the down payment on the Wilmington property; however, no such evidence was provided.

13.    After Ms. Carter purchased the Wilmington property, Mr. Mugno resided there with Ms. Yodice and Brianna Mugno.

14.    On June 3, 2005, Ms. Carter transferred the Wilmington property to Ms. Yodice by quitclaim deed for no consideration.

15.    Mr. Mugno made payments directly to the mortgage company for the Wilmington property, which he characterized as rent payments at the § 341 meeting.

16.    On January 20, 2005, Mr. Mugno met with Mr. Gemborys for an initial consultation.

17.    At the January 20, 2005 visit to Mr. Gemborys' office, Mr. Mugno filled out an initial consultation questionnaire.

18.    On the questionnaire, Mr. Mugno revealed that he had transferred property in the past four years. Mr. Gemborys testified that it was his practice to inquire into the details of such a transfer at the initial conference.

19.    Under "Office Use Only" on the questionnaire, the box stating "is undecided" was scratched out, and the box stating "will retain on next appointment" was checked.

20.    Seven days later, on January 27, 2005, Mr. Mugno met with Bradford Sanders, a former associate attorney at Butler & Butler, L.L.P.

4

21.    Mr. Mugno brought Ms. Yodice to the consultation with Mr. Sanders even though Ms. Yodice was not seeking to file bankruptcy.

22.    From the January 27, 2005 consultation, Mr. Sanders' handwritten notes indicated that the debtor had provided "$40,000 on house in fiance's mother's name back in September."

23.    At the hearing held March 23, 2006, Mr. Sanders testified that, based on this transfer of funds to Ms. Carter for the down payment on the Wilmington property, he had advised Mr. Mugno to wait a year after the transfer before filing a Chapter 13 bankruptcy case; otherwise, the transfer would have to be disclosed in the petition. He further stated that, if the trustee asked about the transfer, disclosure would be required.

24.    Mr. Mugno remembered specific details from his consultation with Mr. Sanders. He said that Mr. Sanders looked at him suspiciously and continued to comment on Mr. Mugno's New York Yankees watch. Mr. Mugno said that he did not retain Mr. Sanders because he was too expensive and because he did not feel comfortable with him.

25.    Mr. Mugno deposited weekly earnings from Wilmington Hyundai in Ms. Yodice's bank account.

26.    Mr. Mugno had no bank account of his own for fear that creditors would seize funds in the account.

27.    On October 11, 2005, Mr. Mugno met again with Mr. Gemborys and retained him to file a Chapter 7 case.

28.    On October 13, 2005, Mr. Mugno filed a Chapter 7 case.

29.    On November 14, 2005, Mr. Mugno filed his schedules and statements.

30.    Mr. Mugno did not disclose any interest in the Wilmington property.

31.    Mr. Mugno failed to disclose any transfers of income that he had made within the year into Terri Yodice's bank account.

32.    At the § 341 meeting held in November 2005, Mr. Gemborys witnessed his client misrepresent the sale of the New York property and failed to take remedial measures. At the § 341 meeting before the former Chapter 7 trustee, Algernon L. Butler, III, the debtor testified under oath that the sale took place in 2002 for $275,000.00 and that, after satisfying the existing mortgage and tax liens, the debtor had received $20,000.00 from the sale. Coincidentally, this false statement under-represented what Mr. Mugno actually received by close to the amount of the down payment on his fiance's mother's house. The debtor testified that he had the closing documents from the sale and would provide them to the trustee; however, following the § 341 meeting, no closing documents were provided. On March 2, 2006, the subsequently appointed Chapter 7 trustee, James B. Angell, served interrogatories and requests for production on Mr. Mugno, which included a request for the closing documents on the New York property. On April 4, 2006, Mr. Angell moved to compel those documents. Mr. Mugno responded that he no longer had closing documents and that he was unable to locate the closing attorney. However, the record suggests that Mr. Mugno had such documents, as his 2004 tax return was prepared by Liberty Tax Service in Wilmington, North Carolina, on February 3, 2005, and it reflected the terms of the sale. It was only after Mr. Angell independently tracked down the closing attorney in New York  and asked the debtor to authorize the release of closing documents that records of the sale were provided by the debtor. The records revealed that the sale of the property occurred July 29, 2004, the purchase price was $381,100.00, and a check of sale proceeds was issued to the debtor in the amount of $62,204.83.

6

33.      At the § 341 meeting held in November 2005, Mr. Gemborys witnessed his client misrepresent his client's interest in the Wilmington property and took no remedial measures. The debtor denied the transfer of money toward a down payment on the Wilmington property. He stated that he had no interest in the Wilmington property and that he was making mortgage payments as rent to reside at the Wilmington property. At later hearings, the court gave the debtor an opportunity to present documentary evidence to support his position that he did not provide the funds for the down payment on the Wilmington property; however, no such evidence was produced. The court also gave Ms. Yodice the opportunity to provide documentation that the money came from other sources, and no such documentation was produced. In its order entered May 17, 2006 granting the motion to reconvert this case to Chapter 7, the court concluded that Mr. Sander's notes and testimony regarding his consultation with Mr. Mugno had established by a preponderance of the evidence that the transfer had in fact occurred.

34.      At the hearing on February 17, 2006, Mr. Gemborys stated that, in preparation of Mr. Mugno's bankruptcy case, he had not obtained any documents from Mr. Mugno regarding the sale of the New York property or the use of proceeds from that sale.

35.      Mr. Gemborys manufactured a conflict of interest so that Mr. Butler, the originally appointed Chapter 7 trustee, would recuse himself from the case. Mr. Mugno met with Mr. Gemborys on January 20, 2005. One week later, Mr. Mugno and his fiancé met with Bradford Sanders of Butler & Butler, L.L.P. It is inescapable that Mr. Gemborys sent Mr. Mugno to Mr. Sanders in order to create a conflict of interest. Mr. Sanders was a new associate attorney who was virtually unknown in the bankruptcy community. Mr. Mugno provided no definitive reason as to why he sought this new associate's advice, stating that he either found him in the Yellow Pages or while in downtown Wilmington. Then, after a year

7

had passed since the purchase of the Wilmington property, Mr. Mugno met again with Mr. Gemborys to conveniently file a case at a time when the transfer would not have to be disclosed on the petition.

This finding of fact is bolstered by Mr. Gemborys' conduct in <u>Trustee v. Sledge (In re Sledge)</u>, 03-02654-8-RDD (Bankr. E.D.N.C. Oct. 11, 2006)(J. Doub), where Mr. Gemborys instructed his client to visit the office of Butler & Butler, L.L.P. in order to create a conflict of interest before converting the case to Chapter 7 so that Mr. Butler would not serve as the Chapter 7 trustee.

36.    Prior to the § 341 meeting, Mr. Butler acknowledged that Mr. Mugno had seen Mr. Sanders, an associate at his law firm, for a one-time consultation. However, after Mr. Butler questioned Mr. Mugno at the § 341 about the transfer of money for the purchase of the Wilmington property, Mr. Gemborys asked Mr. Butler to recuse himself. Mr. Butler agreed to recuse himself.

37.    Mr. Gemborys then sought Mr. Angell, the successor Chapter 7 trustee, to recuse himself from the case based upon the same manufactured conflict of interest that Mr. Gemborys had created when he sent Mr. Mugno to Mr. Sanders. Mr. Gemborys asserted that Mr. Butler had provided privileged information to Mr. Angell. However, in his investigatory role as trustee, Mr. Angell would have obtained the same information from listening to a recording or obtaining a transcript of the § 341 meeting. Moreover, the court concluded that Mr. Mugno had waived the attorney-client privilege when he brought Ms. Yodice to the consultation with Mr. Sanders.[3]

38.    Mr. Gemborys witnessed the debtor make false statements under oath at hearings

_____

[3]At the time of the consultation with Mr. Sanders, Ms. Yodice was not married to the debtor and was not seeking legal services from Mr. Sanders. She was a third party that destroyed the attorney-client privilege.

before this court regarding when the debtor had first consulted Mr. Gemborys, and Mr. Gemborys failed to take any remedial measures regarding that falsity. At the May 2, 2006 hearing on the motion to reconvert the case to Chapter 7, the Chapter 13 trustee, Robert R. Browning, asked the debtor a number of times whether his consultation with Mr. Sanders on January 27, 2005 was his first consultation with an attorney, and the debtor testified under oath that Mr. Sanders was the first attorney that he had consulted.

Mr. Browning:   Had you been to see any attorney prior to going to see Mr. Sanders?

Mr. Mugno:   No.

Mr. Browning:   Had you talked to any attorney on the telephone prior to going to see Mr. Sanders?

Mr. Mugno:   I spoke to someone in the phonebook, yeah. And they were like, they were discussing something about half the price that he was talking about so.

Mr. Browning:   So why did you go see Mr. Sanders?

Mr. Mugno:   I don't recall why we, how we picked him. Um. I don't know if it was just out of the phonebook or we were downtown or I don't recall how I picked him. But I know it was a, it was a mistake when we were talking to him.

Mr. Browning:   He was the first attorney you went to see, is that right?

Mr. Mugno:   I believe so. I only saw him and then Peter afterward. So, I spoke to someone over the phone, but the actual ones I went and spoke to is only him and Peter.

9

| | |
|---|---|
| Mr. Browning: | But you had not spoken to an attorney about the bankruptcy prior to going to see Mr. Sanders? |
| Mr. Mugno: | Right, right. |

At the hearing held August 17, 2006, Mr. Mugno again testified under oath that Mr. Sanders was the first attorney that he had seen about filing a bankruptcy case.

| | |
|---|---|
| Mr. Angell: | How did you find Bradford Sanders? How did you come to see him? |
| Mr. Mugno: | Through a Yellow Page. |
| Mr. Angell: | Had you met with any other attorney prior to him? |
| Mr. Mugno: | No. |
| Mr. Angell: | And then some period of time lapsed. I guess you saw him in January 2005? |
| Mr. Mugno: | Yes. |
| Mr. Angell: | And then, when did you go see Mr. Gemborys? |
| Mr. Mugno: | Guess, uh, September or something like that. |
| Mr. Angell: | Okay, September or October, would it have been? |
| Mr. Mugno: | Yeah. |

These statements were clearly false as evidenced by Exhibit EE presented by the Chapter 7 trustee at the August 17, 2006 hearing, which consisted of an initial consultation questionnaire from the Law Offices of Peter K. Gemborys signed and dated by Mr. Mugno on January 20, 2005. The completed questionnaire shows that Mr. Mugno saw Mr. Gemborys one week prior to his meeting with Mr. Sanders.

39.    Upon discovering that Mr. Gemborys had allowed his client to perjure himself at the

10

August 17, 2006 hearing, the court disqualified Mr. Gemborys as counsel in this case.

40.    At a hearing held February 13, 2006 on the debtor's motions for 2004 examinations of Mr. Butler and Mr. Angell, Mr. Gemborys made a false statement to the court that he had not seen Mr. Mugno prior to the October 2005 consultation.

| | |
|---|---|
| Court: | How did Mr. Mugno happen to get to Mr. Sanders? Was that the first lawyer he went to see about bankruptcy? |
| Mr. Gemborys: | I assume so. He didn't see me until October. He said he saw Butler & Butler in January. |

As noted above, the record reflects that Mr. Mugno saw Mr. Gemborys before the consultation with Mr. Sanders. This is supported by the initial consultation questionnaire signed by Mr. Mugno on January 20, 2005.

41.    Mr. Mugno's testimony under oath that he failed to remember his first consultation with Mr. Gemborys is not supported by the evidence. When confronted about the January 20, 2005 consultation, the debtor said that he suffered from poor memory and that he did not remember going to Mr. Gemborys' office in January of 2005. Yet, the consultation with Mr. Gemborys took place seven days before the consultation with Mr. Sanders, which the debtor remembered vividly. It is implausible that Mr. Mugno could remember details from the Sanders consultations, such as Mr. Sanders questioning him about a Yankees watch, and yet not remember anything from the first consultation with the attorney he in fact retained, Mr. Gemborys.

42.    Mr. Gemborys also stated that he did not remember meeting Mr. Mugno in January 2005 and that the subject had not been addressed at the October 2005 consultation. This testimony was not

11

credible.

43.     Neither Mr. Mugno nor Mr. Gemborys provided medical evidence to support their memory loss of the January 2005 consultation.

44.     At the August 21, 2006 hearing, Mary Tatum, the paralegal at Mr. Gemborys' office, explained that Mr. Gemborys' office has a file for first appointments only arranged in alphabetical order. According to Ms. Tatum, until a client comes into the office for a follow-up appointment, no separate file is maintained for that prospective client. Ms. Tatum said that approximately every six to seven months, the office staff goes through the first appointments only file and calls prospective clients who have not come in for follow-up appointments  to see if they are still interested in filing bankruptcy. If not, the initial consultation questionnaires are thrown away.

45.     Ms. Tatum's testimony of August 21, 2006 lacks credibility that, while looking for an unrelated document during the previous week, she had discovered the January 20, 2005 consultation form and included it in Mr. Gemborys' notebook. Ms. Tatum stated that every six to seven months the first appointments only file was reviewed. Between January 20, 2005 and the work week starting August 14, 2006 when Ms. Tatum purportedly discovered the document, approximately nineteen months had passed. Under the alleged office procedure, office personnel would have reviewed the first appointments only file two or three times between the time of Mr. Mugno's initial consultation and the time the document was allegedly discovered. Thus, it is inescapable that the document would have been discovered earlier under normal office procedure. Just considering the time between the October 11, 2005 follow-up consultation and the work week of August 14, 2006 when the document was allegedly discovered, ten months had passed. Ms. Tatum admitted that a file had been created for Mr. Mugno on October 11, 2005 when he

12

made his first payment. Thus, at the time the document was allegedly discovered, Mr. Mugno would have had a personal file of his own for ten months. With the large volume of activity in this case and Ms. Tatum's own testimony that she had met Mr. Mugno "a lot" when he had visited Mr. Gemborys or made payments, it is logical that office personnel cleaning the first appointments only file during that ten-month period would have discovered the initial consultation questionnaire, recognized that Mr. Mugno was a paying client with his own file, and placed the January 20, 2005 consultation questionnaire in his file.

46.    Mr. Gemborys obstructed the trustee's investigation of the financial affairs of the debtor and failed to assist Mr. Mugno in cooperating with the trustee in fulfilling the trustee's duties and in surrendering all property of the estate and any recorded information including books, documents, records and papers relating to the property of the estate. After Mr. Angell sought information from the debtor regarding Ms. Carter and the debtor's bank accounts and tax returns, Mr. Gemborys moved to take 2004 examinations of Mr. Butler and Mr. Angell to show that Mr. Angell had confidential information gleaned from the debtor and Ms. Yodice's consultation with Mr. Sanders. The court conducted a hearing and denied the motion, finding that Mr. Angell had acted properly by investigating the debtor's financial affairs and that he had been duty-bound to act on any information that he had received regarding the debtor and his financial affairs.

Mr. Gemborys failed to assist Mr. Mugno in producing documents pursuant to the trustee's investigation. Mr. Mugno represented at the first § 341 meeting held in November 2005 that he had closing documents pertaining to the sale of the New York property in his possession, but he never produced those documents. On March 2, 2006, Mr. Angell served interrogatories and requests for production on the debtor. On March 23, 2006, the court ordered the debtor to comply with the trustee' request for

13

discovery. The debtor failed to produce documents relating to his funds, documents relating to the closing of the New York property, and documents related to a loan he had taken out on his insurance policy. On April 4, 2006, the trustee moved to compel those documents. On April 13, 2006, Mr. Gemborys provided a response stating that he had just recently obtained documentation relating to the loan and that he could not find the closing attorney's name regarding the New York property. It was only after the trustee tracked down the closing attorney in New York and sought authorization for release of records from the debtor, that the debtor produced documents pertaining to the closing.

Even though the transfer of sales proceeds for the purchase of the Wilmington property was a subject of investigation in the debtor's case, Mr. Gemborys declared that he was representing Ms. Yodice and Ms. Carter, and he prevented the trustee from directly speaking to them. Mr. Gemborys stated at the August 17, 2006 hearing that he represented Ms. Yodice and Ms. Carter for a limited time frame to assist in the production of documents.  However, his representation of Ms. Yodice and Ms. Carter effectively acted as a shield against the trustee's investigation in this case.

Mr. Angell filed motions for Rule 2004 examinations of documents of Ms. Yodice and Ms. Carter, which motions were granted on February 14, 2006. Ms. Yodice and Ms. Carter were to produce the documents by February 23, 2006 at 5:00 p.m. On February 17, 2006, Mr. Angell moved for a 2004 examination of Ms.  Carter.  Thereafter, on February 21, 2006, Mr. Gemborys filed a motion to convert the case to Chapter 13 stating no reason for the conversion. On February 22, 2006, the court granted Mr. Angell's motion for a 2004 examination of Ms. Carter and directed her to appear on March 9, 2006 at 11:30 a.m. at the Wilmington courthouse for the examination. On the afternoon of February 23, 2006, the last day for production of documents pursuant to the February 14, 2006 orders, Mr. Gemborys filed

14

responses on behalf of Ms. Yodice and Ms. Carter objecting to the Rule 2004 examinations of documents and requesting a hearing. On February 23, 2006, Mr. Gemborys also filed a motion to quash a subpoena issued for Ms. Yodice. On February 23, 2006, the court denied the relief requested in the responses and the motion to quash, as they gave no grounds for relief and were simply being used as dilatory tactics until conversion took place. Despite the court's denial of the relief requested, Mr. Gemborys failed to facilitate the production of the requested documents. On February 24, 2006, the case was converted to Chapter 13, based upon a one-time right to convert, but, on that same day, Mr. Angell filed a motion to reconvert the case to Chapter 7.

On March 2, 2006, Mr. Gemborys' employee, Calista Vitale, wrote an email to the clerk's office to determine whether Ms. Yodice and Ms. Carter would still have to comply with the orders issued in the Chapter 7 case. The email states:

> Peter needs clarification regarding our client, Dennis Mugno. Since this Chapter 7 case has now been converted to a Chapter 13, do Ms. Yodice and Ms. Carter still have to comply with the orders issued in his Chapter 7 case? Carter has a 2004 exam scheduled for 4/19/06.[4] And there are two orders to produce documents.

This email is designated as Plaintiff's Exhibit JJ. In addition, the handwritten office notes of Ms. Tatum, admitted as Plaintiff's Exhibit HH, state: "talked to Terry, filed to convert, Angell stopped, tech. still trustee." Mr. Gemborys failed to produce Exhibit JJ and Exhibit HH in response to the Chapter 7 trustee's subpoena of records. Both documents support that, by converting the case to Chapter 13, Mr. Gemborys attempted to avoid the examination of Ms. Carter and production of documents pertaining to the purchase

---

[4] This date in the email is a typo as the examination of Ms. Carter was scheduled for March 9, 2006.

of the Wilmington property.

Particularly, in the motion for reconversion, Mr. Angell asserted that the debtor could not propose or perform a confirmable Chapter 13 plan. On March 9, 2006, Mr. Gemborys sought a 30-day extension to file a Chapter 13 plan and amended schedules and statements in this case. On March 15, 2006, the court conducted a hearing on the trustee's motion to reconvert the case to Chapter 7 and deferred ruling on the matter until the next hearing. In its order entered March 23, 2006, the court gave the debtor additional time to file amended schedules and statements.

On March 30, 2006, Ms. Yodice and Ms. Carter served responses pursuant to the order granting the 2004 examination of documents and pursuant to subpoenas issued in the case. On April 13, 2006, the trustee filed a motion to show cause for why they should not be held in contempt for failing to fully provide the required documents. Ms. Yodice and Ms. Carter provided no documentation relating to the purchase of the Wilmington property, including no documentation supporting the source of the money for the down payment. Moreover, Ms. Yodice and Ms. Carter failed to produce certain bank records, leaving out relevant periods of time relating to the closing of the New York property and purchase of the Wilmington property. On April 24, 2006, the court granted the motion to show cause and requested that Ms. Yodice and Ms. Carter appear at a hearing on May 2, 2006. The hearing held May 2, 2006 was an opportunity for the debtor, Ms. Yodice, or Ms. Carter to come forward with documentation showing that the down payment on the Wilmington property was funded by other sources than the sales proceeds from Mr. Mugno's sale of his New York property; however, that did not occur.

At the May 2, 2006 hearing, the court concluded that the motion for conversion to Chapter 13 had been filed in bad faith. The court found that the facts of this case indicated a pattern of evasiveness and

16

inconsistency. The bad faith aspects centered around the sale of the New York property and the subsequent purchase of the Wilmington property, as Mr. Mugno failed to provide any documentation to support that he had not made the down payment on the Wilmington property. The court concluded that Mr. Sanders' testimony on March 23, 2006 and his notes from the January 27, 2005 consultation had established by a preponderance of the evidence that the transaction had occurred. In addition, the court considered Mr. Angell's testimony that the debtor had failed to disclose transfers of income from working at Wilmington Hyundai to Ms. Yodice's bank account. On May 17, 2006, the case was reconverted to Chapter 7. On June 6, 2006, Mr. Gemborys on behalf of his client moved to waive the second § 341 meeting, asserting that Mr. Mugno had already provided ample testimony. The court denied the motion.

47.     On May 30, 2006, the trustee moved for disqualification of the debtor's counsel, a motion for disclosure of fees paid to counsel, and a motion for the disgorgement of those fees.

48.     On July 27, 2006, Mr. Gemborys filed a motion to waive discharge on behalf of the debtor. While the court accepted the waiver after taking the debtor's testimony on August 17, 2006, the court notes that it is an unusual practice for a debtor to waive his discharge, and the waiver conveniently occurred at a time when Mr. Gemborys' conduct was at issue.

49.     Mr. Gemborys failed to comply with the Chapter 7 trustee's subpoena of records and made false statements under oath that he had complied with the subpoena. On August 4, 2006, Phillip Paine, attorney for the Chapter 7 trustee, served a subpoena on Mr. Gemborys. Specifically, the subpoena requested Mr. Gemborys to provide:

> All notes, files, records of communications or any other documents in your possession relating to or regarding Dennis Mugno (the "Debtor"), including without limitation all letters, handwritten notes, email or postal communications with the Debtor, email or postal

17

communications with any third party regarding or relating to the Debtor, recordings or notes regarding any conversation with any third party regarding the Debtor; all billing records regarding services provided to the Debtor or on his behalf, all receipts or other evidences of payment of any sums by the Debtor to you and all documents received by you from the Debtor or received by you from a third party on the Debtor's behalf or regarding the Debtor.

At the August 17, 2006 hearing, the following series of questions and answers were given:

| | |
|---|---|
| Mr. Angell: | Did you respond to that subpoena here today? |
| Mr. Gemborys: | Yes. |
| Mr. Angell: | And how did you respond to it? |
| Mr. Gemborys: | I provided you documents. |
| Mr. Angell: | And what documents are those? Are those the documents labeled as plaintiff's Exhibit AA? |
| Mr. Gemborys: | Um, I believe so. |
| Mr. Angell: | Can I hand up your copy? |
| Mr. Gemborys: | Yes. |
| Mr. Angell: | From your notebook? |
| Mr. Gemborys: | Well, just if you'd hand me that. |
| Mr. Angell: | I'm happy to do that. |
| Mr. Gemborys: | (pause for reviewing documents) Yes. |
| Mr. Angell: | Mr. Gemborys, are there any documents that are described in this subpoena that you did not give me here today? |
| Mr. Gemborys: | Uh, no. |

Mr. Angell:          No?

Mr. Gemborys:        No.

Mr. Angell:          So.

Mr. Gemborys:        The only thing is there may be some receipts but I wasn't able to locate the receipt book.

Mr. Angell:          Okay, but let me be clear. Your file with respect to Mr. Mugno is this?

Mr. Gemborys:         Well, I believe you asked me for any records of communication between myself and my client, and that is the extent of it. Any other communication between myself and a third party, uh, you would already have in your possession because you would be the third party. You would have been the recipient of those.   Uh, that's the extent of any communications between my client and any third party.

Mr. Angell:          Okay, let me break this down. Are there any notes in your possession that relate to Dennis Mugno?

Mr. Gemborys:        Not, I mean other than what you received, no.

Mr. Angell:          That's all the notes that you have on this file?

Mr. Gemborys:        Yes.

Mr. Angell:          No notes of hearings, notes of telephone calls, notes of legal research?

Mr. Gemborys:        As you can tell, I brought in a blank legal pad. I generally don't make a lot of notes.

Mr. Angell:          Do you make them on your computer or anything like that?

19

Mr. Gemborys:      No.

Mr. Angell:      Uh, and there are no other files? You don't have any other documents related to any debts of Mr. Mugno? Is that correct?

Mr. Gemborys:      No. The only documents I would have would be the Schedules D, E and F, which are already in the file. That's the only thing.

Mr. Angell:      So, the sole thing which you haven't provided are, uh, letters to and from me or email correspondence to and from me. This and any pleadings in the case. Would that be a fair statement?

Mr. Gemborys:      And any, uh, communications, for example, to his life insurance agent or to his closing attorney, which you've already received.

Mr. Angell:      But that's it. Is that right?

Mr. Gemborys:      Yes.

After the court took a recess, Mr. Angell questioned Mr. Gemborys about the notebooks sitting on Mr. Gemborys' desk.

Mr. Angell:      Uh, Mr. Gemborys, back to Exhibit BB, uh, and the subpoena we issued in this case. I asked you to produce all of this stuff and you indicated that AA is the only thing other than your correspondence to me and pleadings in this case. Is there anything else that, that, that's excluded then that?

Mr. Gemborys:      Other than emails maybe to Al Butler.

Mr. Angell:      How about these notebooks over there? Do they relate to this case?

Mr. Gemborys:      Um, they are full of, um, pleadings that you filed, pleadings that I filed,

20

|                 | things like that.                                                                                                                                                                                                                                                                       |
|-----------------|------------------------------------------------------------------------------------------------------------------------------------|
| Mr. Angell:     | But they are part of your files?                                                                                                   |
| Mr. Gemborys:   | Yeah, but I'm just telling you that you'll find some pleadings and things like that.                                               |
| Mr. Angell:     | Do you have any objection to our inspecting those?                                                                                 |
| Mr. Gemborys:   | I do. It's, it's my property and I'd rather you not.                                                                               |
| Mr. Angell:     | But it's also to the subpoena isn't it?                                                                                            |
| Mr. Gemborys:   | I understand that but I've handed you what you've asked for and that's the extent of it.                                           |
| Mr. Angell:     | Your honor, I think we're entitled to review his files.                                                                           |
| Court:          | I agree. If that's what you brought here, that is a file in this case. I've said you don't have any attorney-client or work product privilege, then they're subject to inspection.[5] The fact that they're, they're obviously your personal property that's the whole point of this. Unless there is some basis I don't see, they are completely responsive to the subpoena. |
| Mr. Angell:     | Your honor, I don't want to adjourn this. If I could have my paralegal and                                                        |

---

[5] On August 4, 2006, the trustee filed a motion in limine for an evidentiary ruling prior to the August 17, 2006 hearing on the trustee's motion for disqualification, disgorgement and sanctions to determine whether the attorney-client privilege or work produce doctrine applied to the documents requested in the subpoena and to the testimony to be provided at the hearing. On August 15, 2006, the court conducted an evidentiary hearing and found that the trustee had established a prima facie showing of fraud in this case. Accordingly, the crime-fraud exception to the attorney-client privilege and work-product doctrine applied.

|  |  |
|---|---|
|  | and perhaps Mr. Paine look at it while I'm questioning Mr. Gemborys. |
| Court: | Again, if you've got anything in there that doesn't relate to this case, Mr. Gemborys, you're not required to produce that. But, if those are notebooks, and independent of whether the documents exist elsewhere in the case file or Mr. Angell has already seen them, they are entitled to look through your file. |
| Mr. Gemborys: | Well, can I go through them and see what doesn't relate? |
| Court: | You can. |
| Mr. Gemborys: | Can I have a few minutes to do that? |
| Court: | Um, actually what I'll do is this. Those were brought here obviously for this hearing today. I'll let you, anything you take out I want to inspect to make sure that I confirm in my view that it doesn't relate to this case. |
| Mr. Gemborys: | Sure. |
| Court: | Why don't we—can we go on Mr.? Do we have to . . . |
| Mr. Angell: | I'm fine with going on. I don't know quite how to handle it but, um. |
| Court: | Let's go on to some other questions. I'm sure you have some more but I will, uh, at the next break, I'll let Mr. Gemborys look through those and pull out anything that he thinks isn't relevant to this case and hand it to me. |
| Mr. Angell: | Okay. |

At the next break, Mr. Gemborys inspected the documents contained in the notebook and handed them to Mr. Angell and his staff. Mr. Angell discovered that there were undisclosed documents in the

22

notebooks that had not been produced pursuant to the subpoena and that were relevant to the case. Most significantly, the notebook contained the initial consultation questionnaire from January 20, 2005. The court admitted this document as Plaintiff's Exhibit EE. When Mr. Angell revealed this document to the court, Mr. Gemborys stated: "Your honor, it's an oversight. The second intake he's talking about is when he [debtor] decided to convert to 13." That statement was a mis-characterization, as Exhibit EE relates to the consultation between the debtor and Mr. Gemborys that took place on January 20, 2005, in complete contradiction to the testimony provided by Mr. Gemborys and his client that the first consultation occurred in October 2005.

Mr. Gemborys also failed to produce a number of other documents responsive to the subpoena. Exhibit FF consists of a credit report order form and consent release signed by the debtor on October 12, 2005 and a Radio Shack account statement for the month of February 2005. He failed to produce Exhibit HH consisting of the handwritten notes of Mary Tatum, Mr. Gemborys' paralegal, on a copy of the order directing a Rule 2004 examination of Myrtle Carter. The notes states: "talked to Terry, filed to convert, Angell stopped, tech. still trustee." He failed to produce Exhibit II, consisting of handwritten notes on a letter from Mr. Angell to Mr. Gemborys dated February 22, 2006, where Mr. Angell said he was in receipt of the motion to convert to Chapter 13 and planned to contest the conversion. Mr. Angell said that, until conversion and his discharge as trustee, he expected all Rule 2004 examinations to be complied with, and he expected to receive closing documents regarding the New York property and documentation regarding loans from Mr. Mugno's insurance policies. At the end of the letter, Mr. Angell said that he assumed Mr. Gemborys was still representing Ms. Yodice but not representing Ms. Carter. The handwritten notes on the letter recommended that Ms. Carter find new representation. Exhibit JJ is an email from Ms. Vitale, a

staff member of Mr. Gemborys' office, to Barbara Langston of the Clerk of Court's office. The email requested clarification as to whether Ms. Yodice and Ms. Carter still had to comply with the orders entered in the Chapter 7 case even though the case had been converted. Mr. Gemborys also failed to produce Exhibit KK, consisting of a letter to Mr. Mugno for payment of attorneys fees including attached work he had completed on Mr. Mugno's behalf. The attached work included handwritten notes, correspondence, and research.

50.    Mr. Gemborys falsely represented to the court that his employee, Mary Tatum, had no knowledge of the debtor's bankruptcy. The trustee subpoenaed Ms. Tatum to appear at the hearing on the motion to disqualify counsel, motion for disclosure of fees, and motion for disgorgement of fees. Mr. Gemborys moved to quash the subpoena asserting that Ms. Tatum, as a paralegal at his law firm, had "absolutely no knowledge or evidence to offer." Mr. Gemborys further asserted that "[t]he subpoena subjects Ms. Tatum to undue burden because no purpose would be served by having her appear in court and she would have to miss work to appear." Ms. Tatum provided an accompanying affidavit with the motion to quash stating: "I met Dennis Mugno during one of his visits to our law office and, therefore, know him. That is the extent of my personal knowledge of him and his bankruptcy case." The affidavit further stated: "I am scheduled to work on August 17, 2006 and would have to miss work to appear in court. It would be an undue burden for me." Based on these representations, the court granted the motion to quash the subpoena of Ms. Tatum. However, at the August 17, 2006 hearing, it was revealed that Mr. Gemborys had not complied with a subpoena issued against him for records. The court reversed its ruling on the motion to quash the subpoena of Ms. Tatum, as it sought her testimony to determine who had talked to Mr. Mugno during his consultations with Mr. Gemborys, who had organized the Mugno file, who had filled out

24

office forms, and whose handwriting appeared on documents that had not been produced to the trustee pursuant to the subpoena.

Ms. Tatum appeared and testified at the August 21, 2006 hearing. Contrary to the representations made in the motion to quash and accompanying affidavit, Ms. Tatum said that she had met Mr. Mugno "a lot" when he had come to the office to visit Mr. Gemborys for a consultation or to make a payment. Ms. Tatum was familiar with the Mugno file. She was also familiar with procedures used in the office regarding consultations, follow-up procedures regarding prospective clients, organization of files, and maintenance of files. In fact, Ms. Tatum knew about the January 20, 2005 initial consultation questionnaire and said that she had placed it in Mr. Mugno's file. Also, contrary to the representations that it would create an undue burden on Ms. Tatum to miss work, Ms. Tatum remained in the courtroom for the rest of the day on August 21, 2006 after she was free to leave.

51.    From the voluminous evidence and multiple hearings in this case, one overall theme is clear. Mr. Mugno approached the bankruptcy court with the intent to keep secret the New York proceeds he had put into his Wilmington residence, and Mr. Gemborys assisted him in every way possible to carry out that aim, including the outright commission of perjury. Mr. Gemborys unreasonably multiplied the activity in this case by shielding the debtor, Ms. Yodice, and Ms. Carter from the trustee's pursuit of information that was necessary for administering the debtor's estate.

52.    This is not an isolated incident of professional misconduct, as there are numerous examples of cases where Mr. Gemborys' conduct has fallen short of the professional standards to be followed by an officer of this court. Mr. Gemborys has advised a debtor to make misrepresentations in his bankruptcy case. In Trustee v. Schoonmaker (In re Schoonmaker), Adv. P. 04-00079-8-AP (Bankr. E.D.N.C. May

25

25, 2006), the debtor's wife and sister revealed that Mr. Gemborys had advised the debtor not to disclose the sale of his residence and to use the sale proceeds to pay advance rent on a residence in Asheville, North Carolina. The debtor also revealed that he had made false statements on his petition at the advice of Mr. Gemborys. The court concluded that it was not the fraudulent intent of the debtor, but the advice of Mr. Gemborys, that drove the debtor to take misguided actions in the case.

53.     In the case of In re Sledge, No. 03-02654-8-RDD (Bankr. Oct. 11, 2006)(J. Doub), Mr. Gemborys failed to maintain a professional standard of care for his client, failed to adhere to the Rules of Professional Responsibility, and failed to disclose fees paid by the debtors for their representation. Prior to filing bankruptcy, the debtors provided information to Mr. Gemborys about their interest and income in a Kentucky trust and their substantial debt to Branch Banking & Trust Company ("BB&T"). Mr. Gemborys allocated the preparation of the petition to his paralegal who failed to disclose the debtors' interest or income in the Kentucky trust on the debtors' petition and listed the BB&T debt as unknown. Mr. Gemborys' paralegal advised the debtors to sign the signature pages of the petition prior to her preparing the petition. The debtors were provided no opportunity to review the petition before it was filed. Once the Chapter 13 case was filed, BB&T objected to the Chapter 13 plan, asserting that the BB&T debt alone exceeded the Chapter 13 limit.

Before converting the case to Chapter 7, Mr. Gemborys advised the debtors to make an appointment with Mr. Butler's firm to create a conflict of interest so that Mr. Butler would not be the Chapter 7 trustee in this matter. William Janvier became the appointed Chapter 7 trustee. Mr. Gemborys did not provide the debtors with a copy of their petition until the § 341 meeting in the Chapter 7 case. The debtors did not have ample time to review their petition before the trustee's examination at the meeting.

26

Following the § 341 meeting, the debtors realized that the petition had failed to disclose the Kentucky trust and had improperly listed income as pension income instead of trust income. The debtors asked Mr. Gemborys to notify Mr. Janvier of the errors, but Mr. Gemborys failed to timely do so. Upon reviewing the debtors' tax returns, Mr. Janvier learned about the trust. He filed an adversary proceeding against the debtors objecting to their discharge, pursuant to 11 U.S.C. § 727(a)(4), based on their failure to disclose their interest in the trust or the trust income. During the course of this adversary proceeding, the court gave the debtors the opportunity to obtain new counsel.

At a hearing on February 10, 2005, the male debtor revealed that, in the hallway prior to a hearing in December 2004, Mr. Gemborys had advised him not to testify that he had talked to Mr. Gemborys about the trust at a pre-petition consultation but to state that their conversation had been about taxes.[6] Clearly, that advice was self-servicing. Had the debtors followed Mr. Gemborys' advice, it would have appeared that the debtors had purposefully concealed their interest in the trust and trust income from their attorney. Following the February 10, 2005 hearing, the debtors compromised the adversary proceeding for denial of discharge with the Chapter 7 trustee. Trustee v. Sledge (In re Sledge), Adv. P. 04-00011-8-AP (Bankr. E.D.N.C. Mar. 31, 2005). The adversary proceeding for denial of discharge would not have been at issue if the petition had been properly prepared and if the debtors had been given adequate time

───────────────────

[6]Prior to this case being assigned to Judge Randy D. Doub, this case and accompanying adversary proceedings were assigned to the undersigned judge. The undersigned found the male debtor's testimony to be credible and compelling at the February 10, 2005 hearing. The court did not enter an order setting forth findings of fact after the hearing, as the debtors and Chapter 7 trustee reached a compromise of the adversary proceeding. Had a compromise not been reached, the court would have made the finding of fact that Mr. Gemborys had advised his client to make misrepresentations to the court.

to review it before filing. Moreover, the Chapter 7 trustee said that he would not have filed the adversary proceeding had the debtors timely corrected the errors on the petition after the § 341 meeting, but Mr. Gemborys failed to timely report those errors to the trustee as requested by his clients.

The Chapter 7 trustee also filed an adversary proceeding for turnover of trust funds. The court concluded that the debtors' contingent remainder interest in the trust was property of the estate. <u>Trustee v. Sledge (In re Sledge)</u>, Adv. P. 04-00033-8-AP (Bankr. E.D.N.C. Jul. 15, 2004). Mr. Gemborys failed to timely handle the appeal of the adverse judgment in that adversary proceeding, and he accepted fees from the debtors to appeal the judgment even though the appeal time had lapsed.

On October 11, 2006, the court sanctioned Mr. Gemborys, pursuant to § 105, to reimburse the debtors their attorneys' fees in the amount of $2,500.00 with $1,400.00 of that going to the trustee for pre-petition fees that would have been part of the bankruptcy estate, to pay the attorneys' fees of the Chapter 7 trustee in the amount of $2,260.00, and to pay the attorneys' fees and expenses in the amount of $10,832.40 for the services of the debtors' new attorney that they employed during the adversary proceeding contesting their discharge. <u>In re Sledge</u>, 03-02654-8-RDD (Bankr. Oct. 11, 2006)(J. Doub).

54.    In various cases, Mr. Gemborys has used the motion to convert his client's case to Chapter 13 as an instrument to avoid the Chapter 7 trustee's actions once it has been revealed that property of the estate has been undervalued or concealed. In <u>In re Scalia</u>, No. 04-09887-8-JRL (Bankr. E.D.N.C. Jul. 26, 2005), the court found that the debtors had substantially undervalued their residence in the case. The court concluded: "If debtors try to retain their residence in a Chapter 7 proceeding by undervaluing their property, vehemently fighting the Chapter 7 trustee when he tries to sell the property, and thereafter converting the case to Chapter 13 when the fight is unsuccessful, the debtors should be prepared to pay

reasonable compensation for the actual and necessary services of the chapter 7 trustee and his attorney."

In In re Johnson, No. 03-08334-8-JRL (Bankr. E.D.N.C. Jun. 26, 2006), the court concluded that the debtor had seriously undervalued her interest in a cooperative apartment building at $3,500.00 when she filed her Chapter 7 case. When the Chapter 7 trustee discovered the true value of the property, he filed a complaint to avoid a post-petition transfer of the debtor's interest in the coop to her sister. Thereafter, Mr. Gemborys on behalf of the debtor filed a motion to convert the case to Chapter 13. Upon conversion, the Chapter 7 trustee filed a motion to reconvert the case. At the hearing on the motion to reconvert, Mr. Gemborys admitted that the case was converted to Chapter 13 to avoid the litigation of the Chapter 7 trustee. At the hearing, the debtor stated that a proper listing price for her interest in the coop would be $300,000.00. The court concluded that cause existed to reconvert the case to Chapter 7 based on a "pattern of evasiveness and inconsistency."

In In re Waters, No. 05-08923-8-JRL (Bankr. E.D.N.C. Aug. 1, 2006), the debtor filed a Chapter 7 case, but he failed to disclose his civil action pending in the Superior Court of New Hanover County in which he sought compensatory damages exceeding $10,000.00. At the § 341 meeting, the debtor denied being involved in a lawsuit. Thereafter, the trustee was contacted by a representative from Atlantic Orthopedic who requested information about the debtor's pending civil action. After learning the name of the debtor's attorney in the civil action, the trustee contacted her to learn more about it. Once the trustee filed a motion for a Rule 2004 examination of the debtor requesting more information about the civil action, Mr. Gemborys on behalf of the debtor filed a motion to convert the case to Chapter 13. The debtor's proposed Chapter 13 plan made no mention of the civil action and did not provide for distribution of any funds that might be awarded from the action. The Chapter 7 trustee filed a motion to reconvert the

case to Chapter 7. The court granted the motion, finding conversion had been done in bad faith. The court warned "Chapter 13 is not a refuge for debtors when there are adverse consequences in Chapter 7. Cases must be converted to Chapter 13 in good faith and with the intention of repaying creditors."

In various cases, Mr. Gemborys has filed a motion to convert the case to Chapter 13 in direct response to the Chapter 7 trustee filing an adversary proceeding against the debtor. In <u>Trustee v. Marshall (In re Marshall)</u>, Adv. P. 02-00217-8-AP, the trustee filed a complaint to revoke the debtor's discharge upon allegedly discovering that the debtor had failed to disclose or surrender severance pay and other moneys and had misrepresented funds in an account as wages eligible for exemption. A half a month after the adversary proceeding was filed, Mr. Gemborys on behalf of his client moved to convert the case to Chapter 13. In <u>Trustee v. Pate (In re Pate)</u>, Adv. P. 02-00159-8-AP, the trustee filed an adversary proceeding after allegedly discovering undisclosed transfers that the debtor had made to the sister and husband within one year of the petition date. Approximately one month later, Mr. Gemborys on behalf of the debtor moved to convert the case to Chapter 13.  In <u>Trustee v. Royal (In re Brinkley)</u>, Adv. P. 03-00018-8-AP, the trustee filed a complaint to avoid the alleged transfer of a lien that had been recorded post-petition with the debtor's permission on an undisclosed vehicle purchased four days prior to filing the petition. A few weeks later, Mr. Gemborys on behalf of the debtor filed a motion to convert the case to Chapter 13.

55.    In a number of cases, Mr. Gemborys' clients have been denied discharge based on misrepresentations and concealment in the bankruptcy case. In <u>Trustee v. Suggs (In re Suggs)</u>, Adv. P. 04-00133-8-JRL (Bankr. E.D.N.C. Apr. 15, 2005)(Carruthers, J. by designation), the court denied the debtors discharge based on misrepresentations regarding ownership of property and false and

misleading statements on their petition based on a clear pattern of reckless indifference to the truth. In Trustee v. Mustafa (In re Mustafa), Adv. P. L-05-00081-8-AP (Bankr. E.D.N.C. Jun. 28, 2005), the court allowed a default judgment against the debtor denying discharge based on the debtor's failure to disclose his interest in business entities, failure to provide documents and business records, and failure to respond to 2004 orders relating to concealment of assets.

56.     Mr. Gemborys has also accused a trustee of racial discrimination in a case where he had not properly reviewed the record before making those accusations on behalf of the debtor. In Trustee v. Simpson (In re Simpson), Adv. P. 04-00144-8-AP (Bankr. E.D.N.C. Oct. 28, 2004), Mr. Gemborys admitted that prior to making the accusations of racial discrimination against the trustee for behavior at a § 341 meeting, he had not attended the § 341 meeting, had not consulted the attorney who represented the debtor at the § 341 meeting, and had not listened to a recording of the meeting. In fact, the first time Mr. Gemborys listened to the § 341 meeting was in the courtroom with the judge, and the recording indicated no ill behavior on the part of the trustee. Moreover, the debtor's testimony supported that the trustee had repeatedly made inquiries regarding the ownership of certain vehicles, but it is the trustee's job to investigate the debtor's financial affairs. The court concluded that the trustee had simply been performing his trustee duties and found no evidence of malignant behavior on the part of the trustee. The court ultimately denied the debtor's discharge, pursuant to 11 U.S.C. § 727(a), for failure to disclose certain vehicles, finding that "the debtor's pattern of concealment and non-disclosure indicates reckless indifference to the truth." Trustee v. Simpson (In re Simpson),  Adv. P. 04-00144-8-AP (Bankr. E.D.N.C. Apr. 29, 2005)(Carruthers, J. by designation).

31

## ANALYSIS

The success of the bankruptcy system hinges upon the integrity of those who practice before the court. In re Moix-McNutt, 220 B.R. 631, 638 (Bankr. E.D. Ark. 1998). As an officer of this court, an attorney is held to a professional standard of conduct that he must abide. The record in this case is replete with incidences of professional misconduct that cannot be tolerated.

### Making False Statements to the Court

The court finds that Mr. Gemborys violated Rule 3.3 of the Rules of Professional Conduct. Mr. Gemborys perjured himself, allowed his client to perjure himself, and engaged in conduct to circumvent the disclosure of a fraudulent transfer. Rule 3.3, entitled "Candor Toward the Tribunal," states in pertinent part:

(a) A lawyer shall not knowingly:
(1) make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
. . .
(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.
(b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.
(c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6 [entitled Confidentiality of Information].

At the hearing held February 13, 2006 on the debtor's motions for 2004 examinations of Mr. Butler and Mr. Angell, the court asked Mr. Gemborys whether Mr. Sanders was the first attorney that Mr. Mugno had consulted about bankruptcy. In response, Mr. Gemborys responded: "I assume so. He didn't

32

see me until October. He said he saw Butler & Butler in January." Mr. Gemborys then witnessed his client

perjure himself on May 2, 2006 and August 17, 2006 when Mr. Mugno testified under oath that Mr.

Sanders was the first attorney that he had met and that he had not consulted with Mr. Gemborys until

October 2005. These statements were completely false, and Mr. Gemborys took no remedial measures

to correct them.

Mr. Gemborys perjured himself at the August 17, 2006 hearing when he testified under oath that

he had complied with the trustee's subpoena of records, as the trustee discovered documents in the

notebook that clearly were responsive to the subpoena, including the initial consultation questionnaire of

January 20, 2005. The questionnaire clearly indicated that Mr. Mugno had consulted Mr. Gemborys a

week prior to his meeting with Mr. Sanders. Upon discovery of the document, Mr. Gemborys attempted

to characterize the document as something else, stating: "Your honor, it's an oversight. The second intake

he's talking about is when he [the debtor] decided to convert to 13." Once it was evident in the eyes of the

court that Mr. Gemborys had in fact consulted with Mr. Mugno on January 20, 2005,  Mr. Mugno and Mr.

Gemborys conveniently asserted that they had no memory of the first consultation. Yet, Mr. Mugno had

vivid memory of a consultation with Mr. Sanders that occurred seven days later in January 2005, and Mr.

Gemborys had the "smoking gun" questionnaire in the notebook that he had taken to court in preparation

for the hearing. The timing of Mr. Mugno's first consultation with Mr. Gemborys was materially relevant

as to whether Mr. Gemborys was knowledgeable about the  pre-petition transfer of proceeds from the sale

of the New York property for the purchase of the Wilmington property and whether he and his client had

developed a plan to circumvent disclosure of that transfer.

Mr. Gemborys also made false representations to the court when he moved to quash the subpoena

33

issued for his paralegal, Ms. Tatum. Mr. Gemborys asserted that Ms. Tatum had "absolutely no knowledge or evidence to offer." However, her testimony on August 21, 2006 proved that she was knowledgeable about the <u>Mugno</u> case.

Rather than taking remedial steps to prevent fraudulent conduct, Mr. Gemborys engaged in fraudulent conduct by assisting Mr. Mugno in hiding the transfer of the sales proceeds from the New York property to the Wilmington property. Mr. Gemborys virtually did everything in his power to shield the transfer. He sought recusal of both Mr. Butler and Mr. Angell as Chapter 7 trustees based upon a conflict of interest that he manufactured by sending his client to Mr. Sanders for a consultation. At the § 341 meeting, Mr. Gemborys witnessed his client misrepresent the terms of the sale of the New York property, and he witnessed his client deny the transfer of the proceeds for the purchase of the Wilmington property. At the May 2, 2006 hearing, Mr. Gemborys witnessed his client concoct a story under oath about where the sales proceeds from the New York property had gone. No corroborating evidence was ever produced to support Mr. Mugno's story. When later asked about the sales proceeds at the August 21, 2006 hearing, Mr. Mugno pled the Fifth Amendment. Moreover, no documentation was ever produced to support the story of Ms. Yodice regarding the alleged sources for the down payment on the Wilmington property. Mr. Gemborys ultimately converted this case to Chapter 13 in order to avoid discovery.

<u>**Representing Clients with Conflicts of Interest**</u>

The court finds that Mr. Gemborys violated Rule 1.7 of the Rules of Professional Conduct, entitled "Conflict of Interest: Current Clients." That rule states:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

34

(1) the representation of one client will be directly adverse to another client; or

(2) the representation of one or more clients may be materially limited by the lawyer's responsibilities to another client, a former client, or a third person, or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

Mr. Gemborys' representation of Ms. Yodice and Ms. Carter significantly interfered with his responsibilities to the debtor. Mr. Gemborys, as the debtor's attorney, had a responsibility to assist the debtor in performing his duties under the Bankruptcy Code and cooperating with the trustee in the performance of the trustee's duties. In re Dunn, 320 B.R. 161, 165 (Bankr. S.D. Ohio 2004). In this case, Mr. Gemborys' representation of Ms. Yodice and Ms. Carter effectively operated as a blockade against the production and examination of documents related to the financial affairs of the debtor, namely the transfer of proceeds from the sale of the New York property towards the purchase of the Wilmington property.

In Gardner v. McGee (In re McGee), No. 00-00098-5-AP (Bankr. E.D.N.C. Jun. 30, 2000)(J. Small), the court ordered an attorney to withdraw from dual representation where he represented the Chapter 7 debtor and the defendants in a fraudulent transfer action brought by the trustee. The court found a conflict of interest in the dual representation, as the debtors' duties in bankruptcy were at odds with their personal interest in making transfers to the defendants who were the debtors' son and daughter-in-law. The court stated:

> It is not unusual for debtors to be dismayed by some of the measures undertaken as part of the administration of their estates; in this case, however, Mr. Dyson's representation of both the debtors and the defendants compounds and solidifies that conflict in that it aligns the debtors, defendants and counsel together against the trustee.

Even though the debtors and the defendants had conceded to the dual representation, the court in <u>McGee</u> noted that the Chapter 7 trustee was a "third person" who had not conceded to the dual representation and to whom both the debtors and their counsel owed responsibilities in the Chapter 7 case.

In the case at bar, Mr. Gemborys argued that Mr. Mugno, Ms. Yodice, and Ms. Carter's "ships were sailing in the same direction." Perhaps these ships were sailing with defective compasses, as it was clear at the first § 341 meeting that the transfer of the sales proceeds from the New York property for the purchase of the Wilmington property was going to be an issue in this case. At that point, Mr. Gemborys should have realized that Ms. Yodice and Ms. Carter were potentially fraudulent transferees and that their interests would not be aligned with the interests of the debtor and the bankruptcy estate. Mr. Gemborys asserted that he only represented Ms. Yodice and Ms. Carter for a limited period of time to facilitate the production of documents, but Mr. Gemborys did everything in his power to prevent production, including the conversion of the case to Chapter 13. This is supported by documents that Mr. Gemborys failed to produce in response to a subpoena of records. Exhibit HH consisting of the handwritten notes of Mr. Gemborys' paralegal, Mary Tatum, states: "talked to Terry, filed to convert, Angell stopped, tech. still trustee." Exhibit JJ consists of an email by Mr. Gemborys' staff member, Ms. Vitale, stating:

> Peter needs clarification regarding our client, Dennis Mugno. Since this Chapter 7 case has now been converted to a Chapter 13, do Ms. Yodice and Ms. Carter still have to comply with the orders issued in his Chapter 7 case? Carter has a 2004 exam scheduled for 4/19/06. And there are two orders to produce documents.

The court concludes that there was a concurrent conflict of interest in the representation of the

36

debtor, Ms. Yodice, and Ms. Carter. Moreover, it was unreasonable for Mr. Gemborys to believe that he could provide competent and diligent representation to each affected client when representing Ms. Yodice and Ms. Carter meant comprising the debtor's ability to fulfill his duties pursuant to the Bankruptcy Code. Most significantly, it was not lawful to represent these three individuals in an effort to shield the disclosure of a fraudulent transfer.

### Failing to Assist Client in Fulfilling the Debtor's Duties

### and Obstructing the Trustee's Investigation

Throughout the hearings on the subject motions before the court, Mr. Gemborys has questioned why the debtor's conduct is being "imputed to him," as if there is no responsibility on the part of the debtor's attorney to assist his client in fulfilling the duties enumerated under 11 U.S.C. § 521. Section 521 imposes affirmative obligations on the debtor, such as the duty "to cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties" and the duty "to surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate." 11 U.S.C. § 521. A debtor's attorney must guide his client in fulfilling these duties. In re Stinson, 269 B.R. 172, 177 (Bankr. S.D. Ohio 2001)(holding the debtor's attorney jointly and severally liable with the debtor for the trustee's fees and expenses where the debtor failed to provide tax records, the debtor failed to turn over tax refunds, and where the debtor's attorney failed to guide the debtor in fulfilling the debtor's duties).

One of the trustee's duties is to investigate the financial affairs of the debtor. 11 U.S.C. § 704(a)(4). The debtor has an affirmative duty to cooperate with the trustee in fulfilling that duty. 11 U.S.C. § 521(3). "A trustee is not required to play detective or to chase the debtors into court to gain their

cooperation." In re Sowers, 97 B.R. 480, 487 (Bankr. N.D. Ind. 1989); In re Kent, 92 B.R. 540, 543

(Bankr. S.D. Fla. 1988); In re Bianco, 5 B.R. 466, 468 (Bankr. D. Mass. 1980). "Indeed the concept of

cooperation with and surrender to the trustee connote the need for willing assistance." In re Sowers, 97

B.R. at 487.

Rather than creating an adversarial environment, an attorney should assist his client in cooperating

with the trustee. In re Dunn, 320 B.R. 161, 165 (Bankr. S.D. Ohio 2004). In Sowers, a bankruptcy court

addressed the conduct of a Chapter 7 debtor's attorney who had made the turnover of estate property

unnecessarily complicated and adversarial.  In re Sowers, 97 B.R. 480 (Bankr. N.D. Ind. 1989). The court

stated:

> In this instance, because of counsel's attitude, he transformed what should have been an
> amicable and cooperation relationship into an adversarial one. Rather than assisting his
> clients in fulfilling their duties under the Bankruptcy Code, he counseled them to either
> ignore or affirmatively violate those obligations, in spite of what he knew to be the facts and
> the law. As a result, the Trustee's administration of the bankruptcy estate and fulfillment
> of her obligations under the Bankruptcy Code has needlessly become more time
> consuming, difficult, and expensive than it should have been. Under these circumstances,
> there can be no conclusion but that counsel has unreasonably and vexatiously multiplied
> these proceedings.

Id. at 487.

In this case, instead of instructing his client to surrender property of the estate, surrender records

relating to property of the estate, and cooperate with the trustee in fulfilling the trustee's duties, Mr.

Gemborys made the trustee the enemy from day one. Mr. Gemborys sought to disqualify certain trustees

based on a manufactured conflict of interest that he created when he sent his client to Mr. Sanders for a

consultation. Mr. Gemborys and his client made false statements to the court that were material to the

38

transfer and whether Mr. Gemborys and his client had taken actions to circumvent disclosure of that transfer. Mr. Gemborys took no remedial actions to correct those falsities. When the trustee sought to investigate the transfer, the trustee was forced to track down the closing attorney in New York in order to obtain closing documentation from the debtor. Moreover, when the trustee sought to obtain information from Ms. Yodice and Ms. Carter about the transfer, Mr. Gemborys said that he was representing them and that the trustee could not speak to them directly. Mr. Gemborys employed tactics to prevent the trustee from obtaining information from Ms. Yodice and Ms. Carter, including the conversion of the case to Chapter 13. Once the case was reconverted for bad faith, Mr. Gemborys sought to prevent his client from having to attend the § 341 meeting. The trustee has been forced to expend estate resources in pursuing the debtor's cooperation in this matter, and the quest for information in this case has been a constant battle for the trustee, requiring him to engage in activities designed for Sherlock Holmes and Watson. The court finds that Mr. Gemborys unreasonably multiplied the activity in this case by shielding the debtor, Ms. Yodice, and Ms. Carter from the trustee's pursuit of information that was necessary for administering the estate.

## Court's Power to Sanction Attorney

Section 105 gives the court broad statutory power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Fourth Circuit holds that § 105 gives a bankruptcy judge the power to regulate litigants appearing before the court. In re Walters, 868 F.2d 665, 669 (4th Cir. 1989). Other circuits have reached the same conclusion. Bessette v. Avco Financial Services, Inc., 230 F.3d 439, 445 (1st Cir. 2000); Placid Refining Co. v. Terrebonne Fuel and Lube, Inc. (In re Terrebonne Fuel and Lube, Inc.), 108 F.3d 609, 612-613 (5th Cir. 1997);

Hardy v. US (In re Hardy), 97 F.3d 1384, 1389 (11th Cir. 1996); Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.), 77 F.3d 278, 284 (9th Cir. 1996); Brown v. Ramsay (In re Ragar), 3 F.3d 1174, 1180 (8th Cir. 1993); Mountain America Credit Union v. Skinner (In re Skinner), 917 F.2d 444, 447 (10th Cir. 1990). The Fourth Circuit has clarified that § 105 "goes beyond contempt of court power," and that the "Bankruptcy Code, both in general structure and in specific provisions, authorizes bankruptcy courts to prevent the use of the bankruptcy process to achieve illicit objectives." Kestell v. Kestell (In re Kestell), 99 F.3d 146, 149 (4th Cir. 1996).

The power to regulate litigants under § 105 includes the power to impose monetary sanctions against an attorney practicing before the court. In re Clark, 223 F.3d 859, 864 (8th Cir. 2000)(assessing attorneys' fees and expenses of Chapter 13 trustee against debtor's attorney); In re Volpert, 110 F.3d 494, 500 (7th Cir. 1997)(imposing fine against Chapter 7 debtor's attorney). In addition to § 105 power, federal courts have inherent power to assess attorney's fees against counsel in various circumstances, including but not limited to where a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991). In the case at bar, the Chapter 7 trustee has filed Plaintiff's Exhibits LL, which itemizes attorney fees totaling $39,277.69 that he has expended in an effort to administer the debtor's estate. The court finds that a monetary sanction against Mr. Gemborys in the amount of $20,000.00 represents a fair apportionment of those fees based on Mr. Gemborys' intentional and vexatious actions to thwart the trustee's ability to effectively administer the case.

The power to regulate litigants under § 105 also includes the power to sanction attorneys by suspension or disbarment. In re Grimsley, Nos. 04-02072-JW, 02-08614-JW, 2006 Bankr. LEXIS 1354 at *26 (Bankr. D.S.C. May 26, 2006)("Pursuant to § 105, this Court has the inherent power to regulate

litigants that appear before this court . . . . Included in this power to regulate litigants is the power to suspend lawyers from practicing before this Court.")(suspending attorney from practicing before the court for 12 months based on the inadequate representation of debtors in the two subject cases, the pattern of inadequate representation of debtors for the past 17 years, and the periodic suspensions of the attorney by South Carolina courts); In re Computer Dynamics, Inc., 253 B.R. 693, 698-99 (E.D. Va. 2000)("Section 105 also provides bankruptcy courts with the authority to hold parties or attorneys in civil contempt [citation omitted]. Pursuant to the civil contempt power, bankruptcy courts can suspend an attorney from the practice of law and condition reinstatement on compliance with a court order.")(imposing dismissal of attorney from the bankruptcy bar of the Eastern District of Virginia until a $5,000.00 sanction was paid); In re Moix-McNutt, 220 B.R. 631, 638 (Bankr. E.D. Ark. 1998)("Numerous cases support the authority of the bankruptcy courts to sanction attorneys by suspension and disbarment under section 105(a).")(removing attorney and law firm from representing debtor in case without fees for services rendered and suspending attorney and law firm from representing debtors in the Eastern or Western District of Arkansas for four years); In re Nesom, 76 B.R. 101, 101-02 (Bankr. N.D. Tex. 1987)("The court further finds that Mr. Evans, by the improper signing of his clients' names to key documents, has impeded and disrupted the bankruptcy process and that such conduct is sanctionable under the inherent powers of this court. 11 U.S.C. § 105.")(disqualifying attorney from practicing in the bankruptcy court or accepting fee from bankruptcy client for 60 days where attorney forged the debtor's signature on statement of affairs and schedules); In re Derryberry, 72 B.R. 874 (Bankr. N.D. Ohio 1987)("The bankruptcy court's civil contempt power is derived from 11 U.S.C. § 105 [citation omitted]. Additionally this court has inherent contempt power to enforce compliance with its orders [citation omitted]. The power of the bankruptcy

judge to issue sanctions for contempt of an attorney is not limited to monetary punishment; it includes the power to discipline an attorney for such conduct in cases and proceedings in this court.")(disbarring attorney from practicing before the bankruptcy court where attorney falsely represented that the bankruptcy estate was ready for distribution in order to moot creditor's motion to discharge him as trustee, where attorney neglected matters entrusted to him as trustee, and where attorney failed to comply with court orders regarding turnover of materials and filing of final reports); In re Lowe, 18 B.R. 20, 26 (Bankr. N.D. Ga. 1981)(stating that the broad jurisdiction conferred under 28 U.S.C. § 1471(c), the judicial powers under 28 U.S.C. § 1481, and the broad authority under § 105 "confer upon Bankruptcy judges ample authority to regulate and control the conduct of persons practicing in the Bankruptcy Court."); In re Lowe, 18 B.R. 26, 27 (Bankr. N.D. Ga. 1982)(suspending attorney from practicing in the bankruptcy court until further court order where attorney had developed office procedures for a non-lawyer to handle virtually all aspects of bankruptcy cases and where attorney shared fees with the non-lawyer). In addition to statutory power under § 105, the court has the inherent authority to disbar or suspend lawyers from practice based upon the lawyer's role as an officer of the court. Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)("a federal court has the power to control admission to its bar and to discipline attorneys who appear before it."); In re Snyder, 472 U.S. 634, 643 (1985)("Courts have long recognized an inherent authority to suspend or disbar lawyers."); In re Evans, 801 F.2d 703, 706 (4th Cir. 1986). While the court recognizes that such grave sanction as suspension or disbarment must not be applied lightly, the court has a duty to prevent an attorney from engaging in professional misconduct, such as lying to the court and furthering illicit objectives of his client. Such abuse of the bankruptcy system has no place in this court.

42

## CONCLUSION

The deal that the bankruptcy laws of this country offers to its citizens, expressed most purely in Chapter 7, is fairly simple: in exchange for complete and honest disclosure of all financial affairs, cooperation with the trustee, and the surrendering of non-exempt property for liquidation, a person is entitled to a discharge of certain categories of debt and a fresh start. The primary duty of debtor's counsel is to make certain that this process works as intended so that clients receive its benefits. Mr. Gemborys fundamentally misunderstands this tradeoff. Rather than treating a petition as initiating a proceeding where cooperation is required, he instead responds as if the petition were a complaint filed by the trustee against his client. The trustees' efforts are met with misstatements, obfuscation, omissions, partial disclosures, baseless arguments, frivolous appeals, and as in this case, outright attempts at fraudulent deception. Not only can the bankruptcy process not work as intended in the face of this conduct, but more importantly, citizens are being harmed by it. In twenty-five years on the federal bench, fourteen of which have been on this court, the undersigned has rarely imposed sanctions on counsel, and none even approaching those to be assessed here. However, the court can no longer deal with issues on a case-by-case basis and ignore the larger picture: the rights of persons who seek equitable relief from this court are being lost and compromised by the unethical conduct of an attorney who holds himself out as an expert in this area of practice.

Accordingly, it is hereby ordered:

1.      Sanctions in the amount of $20,000.00 are assessed against Peter Gemborys, payable to the trustee in this case within 30 days, or if appealed and affirmed, at such time as the appeal is concluded;

2.      Effective November 30, 2006, Peter Gemborys is suspended from practice before the

43

United States Bankruptcy Court for the Eastern District of North Carolina;

       3.     Effective November 30, 2006, the clerk is directed to revoke Mr. Gemborys' password for electronic filing and accept in paper only such filings as may relate to an appeal of this or other orders.

       4.     In the event that this order is appealed, the court declines to stay its order of suspension under B. R. 8005.  Any stay must be sought from the appellate court.

**"END OF DOCUMENT"**